**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 23-cr-00100-JDB** |
| **TYNG JING YANG** | |
| **Defendant.** | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Tyng Jing Yang to eleven months' incarceration, three years of supervised release, $2,000 in restitution, and the mandatory $100 special assessment. The 11-month incarceration recommendation is at the midpoint of the applicable advisory Guidelines range of 8 to 14 months.[1]

## I.       INTRODUCTION

The defendant, Tyng Jing Yang, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in

---

[1] The plea agreement signed by the parties erroneously refers to the sentencing guidelines range for Offense Level 11 and Criminal History Category I as "8 months to 11 months" instead of the actual sentencing guidelines range of 8 months to 14 months. *See* ECF 25 ¶ 5C at 4; USSG Sentencing Table.

1

losses.[2]

Yang, a 61-year-old computer systems administrator, entered the Capitol through the Upper West Terrace door at approximately 2:45 p.m.—despite observing on the Capitol grounds barricades, fences, and even someone who had been pepper sprayed. Inside the Capitol, Yang proceeded upstairs to the Rotunda. When police officers formed a line to expel the rioters from the Rotunda, Yang refused to move back or to leave, and instead, obstructed the officers. Yang pushed back and physically grabbed the arm of one officer, and when another officer pushed Yang towards the exit, Yang confronted the officer and waved his hand in his face instead of leaving. He remained near the advancing police line, and when an officer used his baton to push another rioter back, Yang physically grabbed hold of that officer's baton and interfered with the officer's attempt to clear the Rotunda. Yang finally exited the U.S. Capitol building at approximately 3:15 p.m., having been inside for roughly 30 minutes.

The government recommends that the Court sentence Yang to 11 months' of incarceration for his conviction of violating 18 U.S.C. § 231(a)(3). A 11-month sentence reflects the gravity of Yang's conduct, but also acknowledges his early admission of guilt and lack of any other criminal history.

---

[2] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

II.     **FACTUAL BACKGROUND**

A.     **The January 6, 2021 Attack on the Capitol**

The government refers the court to the stipulated Statement of Offense filed in this case, ECF 26, for a short summary of the January 6, 2021 attack on the United States Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election.

B.     **Yang's Role in the January 6, 2021 Attack on the Capitol**

*Approach to the Capitol*

Tyng Yang participated in the January 6 attack on the U.S. Capitol. His crimes are documented through open-source materials, surveillance footage from inside the Capitol, and body worn cameras from the Metropolitan Police Department.

On January 5, 2021, Yang flew to Washington, D.C., from his home near Chicago, Illinois. The next morning, on January 6, 2021, Yang attended the rally at the Ellipse to show support for the former President.

3



Image 1: Yang at the Ellipse on January 6, 2021.

He then walked to the U.S. Capitol. Once there, he observed barricades, fences, and a person who appeared to Yang to have been pepper sprayed.



Image 2: Yang on the U.S. Capitol Grounds on January 6, 2021.

4

Nonetheless, Yang continued towards the Capitol building. After making his way up exterior stairs to the Upper West Terrace, Yang entered the Capitol building through the Upper West Terrance door at approximately 2:45 p.m. A vastly outnumbered group of police officers had retreated from defending the door less than a minute earlier.



Image 3: Yang Entering the U.S. Capitol Building on January 6, 2021 (CCTV surveillance video footage).

Once inside, Yang walked up a set of stairs and entered the Rotunda where he walked about taking pictures and videos on his telephone. He exited the Rotunda through a different exit at approximately 2:47 p.m. Shortly thereafter, he began speaking with a fellow rioter, Garrett Miller, and they paused outside of the Rotunda in the vicinity of the Small Senate Rotunda.



Image 4: Yang in a Hallway with Garrett Miller inside the U.S. Capitol Building on January 6, 2021.

By approximately 3:03 p.m., Yang and Garrett Miller returned to the Rotunda, entering via the north entrance. Yang can be seen on CCTV pumping his fist in the air, and for the next several minutes Yang and Garrett Miller watched other rioters and the increasing number of police officers filling the Rotunda. They paused to take selfie photographs with one another.



Image 4: Yang (Circled in Yellow) in Rotunda with Garrett Miller (Circled in Red) on
January 6, 2021

Shortly thereafter, at approximately 3:06 p.m., police officers formed a line near the north

exit to expel the rioters from the Capitol Rotunda. The officers wore uniforms and riot gear, and

many displayed extendable batons. Despite the advancing line of police officers, Yang refused to

move back or to leave the Rotunda. Instead, beginning at approximately 3:07 p.m., Yang and

7

Miller moved towards the line of police officers. Yang was involved in several confrontations with the officers. Indeed, as shown in Government Exhibit 1, Yang rushed directly towards the line of officers and joined with other rioters in aggressively confronting them and obstructing their efforts to clear the U.S. Capitol building. *See* Exhibit 1.



Image 5: Still from Government Exhibit 1 Showing Yang at 3:07:21 p.m. Confronting and Obstructing Police Officers in the Rotunda.



Image 6: Still from Government Exhibit 1 Showing Yang at 3:07:26 p.m. Confronting and Obstructing Police Officers in the Rotunda.



Image 7: Still from Government Exhibit 1 Showing Yang at 3:07:36 p.m. at the Edge of the Police Line Confronting Officers.

Yang then physically grabbed one officer's wrist while the officer was working to clear the Rotunda of rioters. *See* Government Exhibit 2 and Images 8 and 9.



Image 8: Still from Government Exhibit 2 at 3:07:26 p.m., Showing Yang Grabbing Hold of the Wrist of a Police Officer Attempting to Push Rioters from the Rotunda.



Image 9: Still from Government Exhibit 2 at 3:07:26 p.m., Showing Yang Grabbing Hold of the Wrist of a Police Officer Attempting to Push Rioters from the Rotunda.

As rioters continued to confront the advancing line of officers, Yang joined with them in refusing to exit the Rotunda and pushing back against the officers.



Image 10: Still from Government Exhibit 1 Showing Yang Pushing Officers Working to Expel Rioters from the Rotunda at Approximately 3:08:56 p.m.

Standing next to Garrett Miller, Yang remained at the front of the mob clashing with the officers. By that time, the line of officers had cleared a portion of the Rotunda and were continuing to push the riotous mob towards the exits. Nonetheless, Yang and Garret Miller remained at the front of the mob.

At approximately 3:09 p.m., one officer began pushing back against Garrett Miller with a police baton. Yang, standing directly behind Miller, reached around him to physically grab hold

12

of the officer's baton as the officer was using it to push Miller.



Image 11: Still from Government Exhibit 1 Showing Yang Grabbing an Officer's Baton
at 3:10:09 p.m.



Image 12: Still from Government Exhibit 1 Showing Yang Grabbing an Officer's Baton
at 3:10:10 p.m.

The officer broke Yang's grip on the baton. Shortly thereafter, Yang and Miller left the front of the mob and walked backwards towards the exit. Yang exited the U.S. Capitol building at approximately 3:15 p.m.

The day after the riot, Yang flew back to Chicago, Illinois.

### *Defendant's Statements*

Yang was arrested on November 21, 2022. After his arrest, he agreed to speak with FBI Special Agents in a voluntary recorded interview. In that interview, Yang acknowledged that he had entered the U.S. Capitol on January 6, 2021, and that he took photographs and videos while inside the building. He explained that he deleted those photographs and videos prior to his arrest

14

because they created difficulties when he was stopped and searched during international air travel. Yang stated that he witnessed violence between rioters while in the U.S. Capitol. Investigators showed Yang various photographs taken on January 6, 2021, and he identified himself in several of them, including a video still showing him grabbing an officer's baton while in the U.S. Capitol Building Rotunda. Yang stated he did not recall grabbing the officer's baton. He also said that he threw away his red "Trump" hat.

Yang subsequently spoke again with investigators in the presence of his attorney; Yang's second interview was consistent with his first.

## III.     THE CHARGES AND PLEA AGREEMENT

On March 29, 2023, a federal grand jury returned an indictment charging Yang with five counts, including, civil disorder in violation of Title 18, United States Code, Section 231(a)(3). On September 13, 2023, Yang was convicted of that offense based on a guilty plea entered pursuant to a plea agreement. ECF 25.

## IV.     STATUTORY PENALTIES

Yang now faces sentencing on 18 U.S.C. § 231(a)(3) (civil disorder).

As noted by the plea agreement and the Presentence Report issued by the U.S. Probation Office, the defendant faces up to five years of imprisonment, a term of supervised release of not more than three years, a fine up to $250,000 (or twice the pecuniary gain or loss of the offense), restitution, and a mandatory special assessment of $100.

### V.     THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007).

The PSR accurately calculated the base offense level, the specific offense characteristic enhancements, and the adjustment for acceptance of responsibility, as set forth in the plea agreement letter. Likewise, the PSR correctly declined to apply the two-level reduction pursuant to U.S.S.G. § 4C1.1; as described below, that reduction is inapplicable here. *See* PSR ¶ 40 and PSR Objections p. 19.

The government's Guidelines analysis follows:

Count One: 18 U.S.C. § 231(a)(3)

|  |  |  |
|---|---|---|
| U.S.S.G. § 2A2.4(a) | Base Offense Level | 10 |
| U.S.S.G. § 2A2.4(b)(1)(A) | Offense Involved Physical Contact | +3 |
| | **Total** | **13** |
| Acceptance of responsibility (U.S.S.G. §3E1.1) | | <u>-2</u> |
| **Total Adjusted Offense Level:** | | **11** |

*See* Plea Agreement at ¶ 5(A).

Recent amendments to the Sentencing Guidelines for 2023 include a new guideline, U.S.S.G. § 4C1.1, which provides for a two-level decrease in the offense level for offenders who have no criminal history points and who meet certain additional criteria. Section 4C1.1 will be in effect at the time of sentencing in this matter but was not considered at the time the parties entered into the plea agreement.

As the PSR correctly acknowledged, Section 4C1.1 does not apply in this case because Yang used violence or credible threats of violence against police officers in connection with the offense. U.S.S.G. § 4C1.1(a)(3) (the two-level reduction does not apply if the defendant "use[d] violence or credible threats of violence in connection with the offense"); *see, e.g.*, PSR § 23 ("Yang and others stood next to the line of the [police officers] but refused to move back or leave the Rotunda"); ¶ 24 ("Yang attempted to push [police officers] back and briefly grabbed the arm of one of the officers"); ¶ 25 ("Instead of leaving, Yang confronted the officer and waved his hand in his face . . . as another officer used his baton to push [another rioter] backwards, Yang grabbed hold of the officer's baton."); ¶ 40 ("Due to the defendant using violence or credible threats of violence in connection with the instant offense, the defendant does not qualify for the two-level reduction"); and PSR Objections p. 19. The government is aware of at least three cases in which courts have rejected the application of § 4C1.1 to January 6 defendants who engaged in violence. *See United States v. Gundersen*, 21-cr-137 (RC); *United States v. Baquero*, 21-cr-702 (JEB); *United States v. Dillard*, 23-cr-49 (JMC).

In addition, the Court should not apply § 4C1.1 here for the further reason that the January 6 riot was a violent attack that threatened the lives of legislators and their staff, interrupted of the certification of the 2020 Electoral College vote count, did irrevocable harm to our nation's tradition of the peaceful transfer of power, caused more than $2.9 million in losses, and injured more than one hundred police officers. Every rioter, whether or not they personally engaged in violence or personally threatened violence, contributed to this harm. *See, e.g., United States v. Rivera*, 607 F.Supp.3d 1, 9 (D.D.C. 2022) 21-cr-60 (CKK) ("Just as heavy rains cause a flood in a field, each

individual raindrop itself contributes to that flood. Only when all of the floodwaters subside is order restored to the field. The same idea applies in these circumstances. Many rioters collectively disrupted congressional proceedings and each individual rioter contributed to that disruption. Because [the defendant's] presence and conduct in part caused the continued interruption to Congressional proceedings, the court concludes that [the defendant] in fact impeded or disrupted the orderly conduct of Government business or official functions").

Moreover, the Sentencing Commission enacted § 4C1.1 based on recidivism data for offenders released in 2010. *See* U.S. SENT'G COMM'N, RECIDIVISM OF FEDERAL OFFENDERS RELEASED IN 2010 (2021), available at https://www.ussc.gov/research/research-reports/recidivism-federal-offenders-released-2010. Given the unprecedented nature of the Capitol attack, there is no reason to believe this historical data is predictive of recidivism for defendants who engaged in acts of political extremism on January 6. This is particularly so given the degree to which individuals, including defendants who have been sentenced, continue to propagate the same visceral sentiments which motivated the attack.

Due to the unique nature of the January 6 mob, the harms caused by the January 6 riot, and the significant need to deter future mob violence, the government submits that even if the Court finds that § 4C1.1 applies, the Court should nevertheless vary upwards by two levels to counter any reduction in offense level. Such treatment would recognize the unique nature of the criminal events of January 6, 2021, coupled with the overwhelming need to ensure future deterrence, despite a person's limited criminal history.

Finally, to avoid unnecessary litigation, if the court declines to apply § 4C1.1, the

government requests that the Court make clear at sentencing that it would have imposed the same sentence regardless of whether § 4C1.1 applies.[3]

The U.S. Probation Office calculated the defendant's criminal history as category I, which is not disputed. PSR ¶ 44; ECF 25 ¶ 5(B). Accordingly, the government's calculation of the defendant's total adjusted offense level, after acceptance of responsibility, is 11.   The calculation of the offense level described above matches the agreed-upon level set forth in the defendant's plea agreement. ECF 25 at ¶ 5(C). The guideline imprisonment range for an offense level of 11 and criminal history category of I is a term of 8 to 14 months.[4]

## VI.    SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.    Nature and Circumstances of the Offense

As shown in Section II(B) of this memorandum, Yang's felonious conduct on January 6, 2021 was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis. Yang not only entered onto the U.S. Capitol grounds without

---

[3] U.S.S.G. § 5C1.1 has also been amended with a new application note providing that if a defendant receives an offense level reduction under § 4C1.1 and either their applicable guideline range is in Zone A or B of the Sentencing Table, or the guideline range overstates the seriousness of the offense, imprisonment may not be appropriate. *See* U.S.S.G. § 5C1.1, comment. n. 10. The government submits that for the same reasons that § 4C1.1 should not be applied in this case, a sentence of imprisonment is appropriate notwithstanding Application Note 10 to § 5C1.1.

[4] As described above, the plea agreement incorrectly listed the sentencing guidelines range for an offense level of 11 and criminal history category of I as 8-11 months, instead of 8-14 months. *Supra* at 1 n.1.

lawful authority but illegally went into the Capitol building itself. When Yang saw police officers work to push the riotous mob from the Rotunda, Yang not only refused to leave but pushed to the front of the crowd to repeatedly—and physically—interfere with the officers as they attempted to clear the Rotunda of rioters. The nature and circumstances of Yang's offenses were of the utmost seriousness, and fully support the government's recommended sentence of 11 months' incarceration.

**B.  The History and Characteristics of the Defendant**

While Yang lacks any criminal history prior to the instant offenses, the seriousness of his conduct on January 6 and in particular his readiness to physically obstruct officers from clearing the Rotunda of rioters weigh heavily in favor of incarceration here.

20

**C.      The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law**

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Yang's criminal conduct on January 6 was the epitome of disrespect for the law. "We cannot ever act as if this was simply a political protest, simply an episode of trespassing in a federal building. What this was was an attack on our democracy itself and an attack on the singular aspect of democracy that makes America America, and that's the peaceful transfer of power." *United States v. Cronin*, 22-cr-233-ABJ, Tr. 06/09/23 at 20. As Government Exhibit 1 makes clear, Yang had every opportunity to simply walk away from the police line that was attempting to quell the civil disorder in the Rotunda. He did not; in fact, he pushed his way to the front of the mob where he could directly confront that police line. While there, he physically interfered with and obstructed the officers attempting to expel the rioters from the Capitol, grabbing the wrist of one officer and the baton of another.

### C.  The Need for the Sentence to Afford Adequate Deterrence

#### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C. § 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[5] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol. The violence at and inside of the U.S. Capitol on January 6 was calculated to interfere with—and did in fact interfere with—one of the most significant and essential processes of American democracy: the peaceful transfer of power. As Judge Moss previously observed:

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble. The damage that [the defendant] and others caused that day goes way beyond the seven-hour delay in the certification. It is a damage that will persist in this country for decades.

*United States v. Paul Hodgkins*, 21-cr-188-RDM, sentencing transcript at 69-70. The gravity of these offenses demands deterrence, as a message to future rioters and would-be mob participants—especially those who intend to improperly influence the democratic process—that these actions have consequences.

#### *Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also

---

[5] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

weighs heavily in favor of a term of incarceration. Although Yang has now expressed remorse and contrition, his conduct on January 6 demonstrated his repeated willingness to knowingly and physically interfere with police officers as they attempted to clear the Rotunda and restore order in the U.S. Capitol building. *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 29-30 ("[The defendant's] remorse didn't come when he left that Capitol. It didn't come when he went home. It came when he realized he was in trouble. It came when he realized that large numbers of Americans and people worldwide were horrified at what happened that day. It came when he realized that he could go to jail for what he did. And that is when he felt remorse, and that is when he took responsibility for his actions.") (statement of Judge Chutkan).

### E.     The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

F.        **Unwarranted Sentencing Disparities**

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider . . . the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017); *accord United States v. Sanchez,* 989 F.3d 523, 540 (7th Cir. 2021). Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity. *See United States v. Daniel Leyden*, 21-cr-314 (TNM), Sent. Hrg. Tr. at 38 ("I think the government rightly points out generally the best way to avoid unwarranted sentencing disparities is to follow the guidelines.") (statement of Judge McFadden); *United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Hrg. Tr. at 49 ("as far as disparity goes, . . . I am being asked to give a sentence well within the guideline range, and I intend to give a sentence within the guideline range.") (statement of Judge Chutkan).

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing

judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[6]

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id*. ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").[7]

---

[6] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

[7] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

In *United States v. Nolan Cooke*, 22-cr-0052-RCL, Cooke waived indictment and pleaded guilty to a single count of 18 U.S.C. § 231. Judge Lamberth sentenced the defendant to 12 months and 1 day of incarceration and 36 months of supervised release based on his conduct on January 6; his guidelines range was 8-14 months (11/I). Cooke helped lead rioters in breaking through the police line guarding the east side of the Capitol building and later bragged he was among the first to break through the barricade; he was present at the standoff with officers outside the Columbus doors for approximately 14 minutes. Cooke pushed against an officer's riot shield and arm, rushed the Capitol steps, and used a flagpole to strike one of the exterior windows, but then left the restricted area outside the Capitol without ever entering the building. Although Cooke admitted to traveling to Washington, D.C., with firearms, he did not bring weapons onto the Capitol grounds. Subsequently, Cooke was cooperative with law enforcement officers when they interviewed him during the execution of a search warrant at his residence.

Like Cooke, Yang made his way to the front of the riotous mob and joined other rioters in confronting police officers. Unlike Cooke, however, Yang succeeded in entering into the Capitol building (for approximately 30 minutes) while Cooke remained outside of the building in the restricted area. Cooke—like Yang—obstructed and impeded police officers as they attempted to

defend the Capitol. Cooke pushed a bicycle rack, an officer's riot shield, and the arm of another officer. Yang grabbed the arm of one officer as well as the baton of another while those officers were actively confronting other rioters. Like Yang, Cooke was cooperative with investigators after they arrived at his residence with a search warrant, admitted his participation in the riot, and had no previous criminal history. Neither Yang nor Cooke are alleged to have brought weapons onto the Capitol grounds.

In *United States v. Ronnie Brian Presley*, 21-cr-0257, Presley pleaded guilty to a single count of 18 U.S.C. § 231. Judge Moss sentenced the defendant to 12 months of incarceration and 26 months of supervised release; his guidelines range was 10-16 months (11/II). Like Yang, Presley entered the U.S. Capitol and made his way to the Rotunda, where he shouted, "Fight for this!" When police officers entered the Rotunda at approximately 3:00 p.m., Presley—like Yang—failed to leave. At approximately 3:08 p.m., Presley physically confronted a police officer by leaning into that officer's baton as the officer tried to push Presley towards the exit. Yang, in contrast, not only grabbed hold of an officer's baton, but also grabbed hold of a different officer's wrist while both tried to clear the Rotunda of rioters. Presley exited the building shortly thereafter but lingered outside the doorway and subsequently grabbed hold of an officer's shield.

In *United States v. Howard Adams*, 21-cr-0358, Adams pleaded guilty to a single count of 18 U.S.C. § 231. Judge Howell sentenced the defendant to eight months of incarceration and 36 months of supervised release based on his conduct on January 6; his guidelines range was 8-14 months (11/I). Adams admitted to being present while other rioters pushed through a line of police officers on the east plaza, and to following behind a group of rioters that pushed away officers

blocking the entrance to the U.S. Capitol building. He passed through the Rotunda, Statuary Hall, and into the Statuary Hall connector where he was stopped by a line of police officers. After other rioters pushed aside those officers, Adams proceeded into the House chamber doorway; unable to proceed further, he returned to the Rotunda at approximately 2:59 p.m. When police officers entered the Rotunda, Adams—like Yang—walked toward the line of officers instead of proceeding to an exit. Like Yang, Adams made physical contact with an officer in the Rotunda attempting to clear the Rotunda. Adams, like Yang, finally exited the Capitol building at approximately 3:15 p.m.

This Court previously sentenced Stephanie Hazelton to 10 days of incarceration and 24 months of supervised release (including 90 days of home detention) after she pleaded guilty to one count of 18 U.S.C. § 231. *United States v. Stephanie Hazelton*, 21-cr-030-JDB. Hazelton's conduct was distinguishable from that of Yang. Hazelton never entered the U.S. Capitol building; rather, she remained in the vicinity of the Lower West Terrace tunnel and verbally encouraged other rioters to breach the police line, without attempting to do so herself. Further, Hazelton never made physical contact with police officers, and as a result, received a significantly lower applicable guidelines range (8/I; 0-6 months). Yang, in contrast, repeatedly made physical contact with police officers as he confronted the police line attempting to clear the Rotunda, grabbing first the wrist of one officer and the baton of another. The resulting higher guidelines range reflects the greater seriousness of Yang's conduct.

## VII.   RESTITUTION

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579,

96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).[8] Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Yang must pay $2,000 in restitution, which reflects in part the role Yang played in the riot on January 6.[9] Plea Agreement at ¶ 13. As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $2,881,360.20 in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of October 2022. *Id.* As noted above in footnote 1, the amount of damages has since been

---

[8] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1).

[9] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

updated by the Architect of the Capitol, USCP, and MPD. Yang's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities. *See* PSR ¶ 28.

## VIII.   CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of eleven months' incarceration, three years of supervised release, $2,000 in restitution, and the mandatory $100 special assessment.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

BY:     *Craig Estes*_____
Craig Estes
Assistant U.S. Attorney
United States Attorney's Office for the
District of Massachusetts (detailee)
Massachusetts Bar No. 670370
craig.estes@usdoj.gov
(617) 748-3100

## <u>CERTIFICATE OF SERVICE</u>

On this 31st day of January 2024, a copy of the foregoing was served upon all parties listed on the Electronic Case Filing (ECF) System.

 /s/ *Craig Estes*_____
Craig Estes
Assistant United States Attorney