## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **Criminal No. 1:23-CR-00100-JDB** |
| | ) | |
| **TYNG JING YANG,** | ) | |
| | ) | |
| **Defendant.** | ) | |

### DEFENDANT'S MEMORANDUM IN AID OF SENTENCING

Tyng Jing Yang ("Mr. Yang") comes before this Court humbled and deeply remorseful for his actions on January 6, 2021 ("January 6") and appears for sentencing following his acceptance of responsibility upon entering a plea of guilty to Civil Disorder, in violation of 40 U.S.C. § 231(a)(3).  Mr. Yang respectfully submits this Memorandum in Aid of Sentencing.

With a large community of support surrounding him, he is sure to turn the page on this dark chapter in his life, and all parties would benefit from the page being turned sooner rather than later.  Based upon his personal history and characteristics, the nature and circumstances of the offense, his lack of criminal history, the minuscule likelihood of recidivism, and the need to avoid unwarranted sentencing disparities, Mr. Yang respectfully requests that the Court impose a term of probation, as such a sentence would be "sufficient, but not greater than necessary," to achieve the legitimate purposes of sentencing.  *See* 18 U.S.C. § 3553(a).

### I.     MR. YANG'S BACKGROUND

Mr. Yang is a sixty-one-year-old (61) husband and father of two (2) adult children.  *See* Final Presentence Investigation Report ("PSR") at ¶¶ 49, 53.  He lives in Hoffman Estates, Illinois

1

(Chicago area) with his wife, Molly. *Id*. at ¶ 53. Mr. Yang's wife is sixty-one (61) years old and is employed in office administration. *Id*. His daughter is thirty-two (32) years old and a laboratory technician in Utah, and his son is thirty (30) years old and employed in the military in Texas. *Id*. Mr. Yang maintains a relationship with his children, and they are aware of this case and are supportive. *Id*. Mr. Yang's wife and children have no reported history of criminal arrests, substance use, or mental health concerns. *Id*.

Although he experienced bullying as a child, Mr. Yang had a "good" childhood and was raised by his parents in Taiwan. *Id*. at ¶¶ 49-50. His childhood hobbies included playing with a toy airplane, building things, and studying. *Id*. at ¶ 50. After growing up in the countryside, his family moved into the city for better educational opportunities. *Id*. He studied hard, got into college, and in 1985 he graduated from Feng-Chia University in Taiwan with his bachelor's degree in computer engineering. *Id*. at ¶ 64. His mother and three of his siblings still live in Taiwan, while his father and one sibling are deceased. *Id*. at ¶ 51-52. Like his wife and children, none of his immediate family members have a reported history of criminal arrests, substance use, or mental health concerns. *Id*. He has a good relationship with his mother and siblings, and his siblings are aware of this offense and are supportive. *Id*.

From approximately 1985 to 1987, Mr. Yang served in the Taiwanese military, was a platoon leader in the Marine Corps, and received an honorable discharge as a Second Lieutenant. *Id*. at ¶ 54. In 1991, Mr. Yang obtained a master's degree in computer and information science from the University of Florida in Gainesville, Florida. *Id*. In 1995, he moved to Canada for four (4) years before immigrating to the United States where he began his career at Motorola working

2

in computer systems administration. *Id*. at ¶¶ 49, 65.  On November 30, 2012, Mr. Yang became a naturalized United States citizen. *Id*. at ¶ 55.

Mr. Yang does not have a reported history of mental or emotional health concerns and has no history of substance abuse or problematic gambling.  *Id*. at ¶¶ 60-63.  He takes medication due to his suffering from glaucoma and high cholesterol.  *Id*. at ¶¶ 57, 59.

Mr. Yang's close family and friends describe him as a selfless and dedicated father with a good heart who works hard to take care of his family and neighbors. *See* Exhibits B – H. Sacrificing his time, energy, and money whenever his family and friends are in need comes naturally to him. *Id*.  He is a trusted employee at Motorola who always demonstrates the utmost respect and kindness towards his co-workers. *Id*.  Those who know him best describe his actions on January 6 as an aberration and "mistake" in an otherwise good man's life. *Id*.

## II.     THE LEGAL FRAMEWORK OF AN ADVISORY GUIDELINE RANGE

While this Court must still correctly calculate the guideline range, *Gall v. United States*, 552 U.S. 38, 39 (2007), it may not treat that range as mandatory or presumptive, *Id*. at 51; *Nelson v. United States*, 555 U.S. 350, 352 (2009), but as "one factor among several" to be considered in imposing an appropriate sentence under § 3553(a).  *Kimbrough v. United States*, 552 U.S. 85, 90 (2007).  The Court must "consider all of the § 3553(a) factors . . . make an individualized assessment based on the facts presented," *Gall*, 552 U.S. at 49-50, and explain how the facts relate to the purpose of sentencing.  *Id*. at 53-60; *see also Pepper v. United States*, 562 U.S. 476 (2011). The Court's "overarching duty" is to "impose a sentence sufficient, but not greater than necessary" to accomplish the goals of sentencing.  *Pepper*, 562 U.S. at 493 (internal quotations omitted).

3

To ensure that the guidelines are truly advisory and constitutional, this Court has the authority to disagree with a guideline as a matter of policy.  Because "the Guidelines are now advisory…, as a general matter, courts may vary [from Guidelines ranges] based solely on policy considerations, including disagreements with the Guidelines."  *Kimbrough*, 552 U.S. at 101-02 (internal punctuation omitted) (citing *Rita v. United States*, 551 U.S. 338, 351 (2007) (holding that district courts may find that the "Guidelines sentence itself fails properly to reflect § 3553(a) considerations")).

Additionally, "[i]t has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue."  *Koon v. United States*, 518 U.S. 81, 113 (1996).  Permitting sentencing courts to consider the widest possible breadth of information about a defendant "ensures that the punishment will suit not merely the offense but the individual defendant."  *Pepper*, 562 U.S. at 488 (citing *Wasman v. United States*, 468 U.S. 559, 564 (1984)).

In this regard, "the district court's job is not [even] to impose a reasonable sentence. Rather, a district court's mandate is to impose a sentence sufficient, but not greater than necessary, to comply with the purposes of section 3553(a)(2)."  *United States v. Forman*, 436 F.3d 638, 644, n.1 (6th Cir. 2006).  Accordingly, "if a district court were explicitly to conclude that two sentences equally served the statutory purpose of § 3553, it could not, consistent with the parsimony clause, impose the higher."  *United States v. Ministro-Tapia*, 470 F.3d 137, 142 (2nd Cir. 2006).

### III.      APPLICABLE U.S. SENTENCING GUIDELINES RANGE

Counsel submits the following United States Sentencing Guidelines ("U.S.S.G.") analysis applies in this case:

**2023 U.S. Sentencing Guidelines**

U.S.S.G. § 2X5.1 – Base Offense Level ........................................................................ 10

U.S.S.G. § 2A2.4(b)(1) – Specific Offense Characteristics ........................................... 3

U.S.S.G. § 3E1.1(a) – Acceptance of Responsibility ..................................................... -2

U.S.S.G. § 4C1.1 – Zero Point Offender Adjustment ................................................... -2

**Total Offense Level ..................................................................................................9**

Mr. Yang has a criminal history score of zero and a criminal history category of I for sentencing purposes. *See* PSR at ¶ 44.   Mr. Yang has no other juvenile adjudications, adult criminal convictions, traffic infractions, arrests, pending charges, or criminal conduct. *Id*. at ¶¶ 42-48.   With a total offense level of nine (9),  counsel submits that the resulting  advisory Guidelines range  should be four (4) months to ten (10) months.

**U.S.S.G. § 4C1.1 – Zero Point Offender Adjustment**

After the government argued in its response to the draft PSR that Mr. Yang should not be granted a two-point reduction pursuant to U.S.S.G. § 4C1.1, the PSR writer removed the two-point reduction that it originally concluded was appropriate in Mr. Yang's case. *See* ECF 28, ECF 30, ECF 32.  The government cites three (3) cases where the U.S.S.G. § 4C1.1 reduction was not applied.  *Id*.  In contrast to those instances where violence or the threat of violence occurred, Mr. Yang's case stands apart as he did not engage in violence or threaten harm in

connection with this offense.

In *United States v. Brian Gundersen*, the defendant "came out behind another rioter and rushed MPD officer C.B., pushing into officer C.B. with his left arm.  Another officer came to officer C.B.'s defense and pushed Gundersen away." *See* 1:21-cr-00137-RC, ECF 54. Furthermore, Mr. Gundersen made statements before his arrival such as, "we might be able to bum rush the white house and take it over." *Id*.  Mr. Gundersen was found guilty of 18 U.S.C. 111(a)(1), Assaulting, Resisting, or Impeding Certain Officers after a stipulated trial. *See* 1:21-cr-00137-RC, ECF 61.  Mr. Gundersen's sentencing was held on July 25, 2023, four months before U.S.S.G. § 4C1.1 was implemented into law.

In *United States v. Julio Baquero*, the defendant "physically resisted officers attempting to clear rioters out of the Rotunda. He grabbed the hand of MPD Officer R.L., who was holding a police baton. Baquero continued to confront MPS officers attempting to clear the Rotunda shouting 'you're a traitor!' at them." *See* 1:21-cr-702-JEB, ECF 41. Additionally, in Mr. Baquero's case, he "rushed at the officers, trying to push one of the doors open and preventing officers from closing the door. Defendant had to be forcibly pulled away from the door by USCP officers." *Id*.  Mr. Baquero was sentenced on May 22, 2023, six months before U.S.S.G. § 4C1.1 was implemented into law.

In *United States v. Kaleb Dillard*, the defendant "went to the front of the crowd at the East Rotunda Doors, where he used a metal tool to smash a window of the doors. . . . Defendant then grabbed U.S. Capitol police officer B.A., who was attempting to close the East Rotunda Doors, from behind and threw him to the ground." *See* 1:23-cr-049-JMC, ECF 27.  Mr. Dillard

was sentenced on November 16, 2023, after pleading to 18 U.S.C. 111(a)(1), Assaulting, Resisting, or Impeding Certain Officers. *See* 1:23-cr-049-JMC.

Mr. Yang's case is distinguishable from these cases.   First, in two of these cases, the defendants were charged and found guilty of a charge that necessarily involves violence, 111(a)(1), Assaulting, Resisting, or Impeding Certain Officers.  Mr. Yang was never charged with any similar conduct.  Second, Mr. Yang never made any threatening statements to officers on the scene or before he arrived in Washington, DC.  Lastly, Mr. Yang's physical contact with the officer was reactive and not with violent intent.

The government further argues that because the events at the Capitol as a whole should be looked at as violent offenses and Mr. Yang was present at the Capitol that day, he could be considered as someone who used violence or threat of violence in connection with that offense. *See* ECF 30-1.    That argument is simply not viable.    Mr. Yang, who was not charged with either conspiracy or as an aider and abettor, cannot be held responsible for violence that was engaged in by others.

Therefore, the Court should overrule the government's objection to the application of U.S.S.G. § 4C1.1 and grant Mr. Yang the two-level reduction.

## IV.    18 U.S.C. § 3553(a) FACTORS

### A.    The Nature and Circumstances of the Offense

Mr. Yang's conduct and involvement in the instant offense is beyond regrettable.  In his letter to the Court, Mr. Yang describes his immense frustration with himself: "I am no longer a law-abiding citizen I once [was] proud of." *See* Exhibit A.  He apologizes to his family members,

friends, colleagues, and law-abiding Americans for the "bad decision" and "embarrassing mistake" he made. *Id*.  He is taking this as a "big lesson for the remainder of [his] life." *Id*.

Mr. Yang entered the Capitol for approximately thirty (30) minutes, between 2:45 p.m. and 3:15 p.m. *See* PSR at ¶¶ 21, 26.  While in the Rotunda, he appeared to take pictures and videos. *Id*. at ¶ 21.  He was not with family or friends.  When officers arrived in the Rotunda to disperse the crowd, Mr. Yang did not leave immediately, and he was caught up in the escalating situation. *Id*. at ¶ 23.  Amid the chaos, Mr. Yang physically touched an officer's arm and another officer's baton. *Id*. at ¶¶ 24-25.  He did so in a moment of what he felt was self-defense during the commotion.  Mr. Yang neither resorted to violence nor issued any threats toward law enforcement officers.  Shortly thereafter, Mr. Yang left the Capitol. *Id*. at ¶ 26.

Mr. Yang went to Washington D.C. on January 6 because he felt like he had not personally involved himself in politics during his time in America. *Id*.  He says, "[b]eing a computer geek with guilt of not doing anything for the past 20 years besides typing on the keyboard, I decided to fly to DC to show my support peacefully and patriotically." *Id*.  On January 6, he was caught up in the emotions and "made the wrong call" by following the crowd into the Capitol. *Id*.  His actions led to events he could have never imagined: being searched twice when traveling by airplane, being arrested by the FBI SWAT team, charged with multiple crimes by the United States, being on the local news, having reporters knock on his door for interviews with his wife, and receiving hate mail in his mailbox. *Id*.

Despite the negative repercussions he has faced because of his actions, and in the face of the inevitable future negative consequences he will experience after sentencing, he ends his letter

to the Court in a way most true to himself: "Thanks for judging my case, I will accept the punishment you decide." *Id*.

        **B.**        **Mr. Yang's Personal History and Characteristics**

Mr. Yang describes himself as "a first-generation immigrant" who is "grateful to be accepted as a US citizen." *Id*.  He loves his job at Motorola, a job which he has maintained throughout his time in this country. *Id*.  He always worked hard to excel at Motorola in order to avoid layoffs so that he and his wife could raise their children without interruption. *Id*.  His children "live happily and do their jobs to contribute to society." *Id*.  Mr. Yang is loved and admired for his hard work and kindness towards others, as evidenced by numerous letters of support submitted on his behalf.  *See* Exhibits B – H.

Captain Ryan Yang, MD ("Captain Yang") is the son of Mr. Yang and is a physician and active-duty officer in the United States Army. *See* Exhibit B.  Captain Yang was taking care of COVID patients at Fort Bliss on January 6 when he heard the news about the Capitol rioters. *Id*. His initial feeling of pride at the military leadership's quick response to the rioters quickly turned to a feeling of dread upon realizing his father was involved with the riots. *Id*.  After calling his father and confirming that he indeed was unlawfully in the Capitol that day, Captain Yang felt "disbelief, disappointment, and even anger," which are emotions he does not typically feel about his father. *Id*.

When Captain Yang confronted his father about why he was at the Capitol, his father answered that he "never planned for the event to become violent" and that he simply wanted to

support Donald Trump. *Id*. To his father, Donald Trump "represented the courage to stand up to China where he believed the rest of American politicians could not." *Id*. His son explains,

> As a Taiwanese American immigrant and former Taiwanese marine, my father has strong anti-[C]hinese political convictions. He fears that economic concessions with the Chinese nation reflect an erosion in the strength of the United States and our commitment to politically support Taiwan. He believed that supporting Trump could somehow protect his brothers, sister, and mother in Taiwan from reliving martial law during the White Terror of 1947.

*Id*.

Mr. Yang raised his son to appreciate the armed forces and instilled in him "the sense of duty, honor, and purpose." *Id*. His father taught him to "stand up for what I believe in and to defend those values with relentless determination." *Id*. Captain Yang witnessed that same determination in his father "in his twelve years of tireless effort at Motorola to obtain permanent residency through the family's H1b work visa." *Id*. His father did this for the sake of his family. *Id*. Not only has Mr. Yang supported his son's pursuit of the American dream, but he supports others in that pursuit as well. *Id*. Captain Yang recalls one time when his father lent him his moped so he could get around during medical school. *Id*. When Captain Yang no longer needed the moped, instead of selling or reclaiming it, his father encouraged him to gift the moped to a couple Captain Yang knew were in need. *Id*.

Captain Yang has witnessed his father experience and express "immense sorrow" and "shame" because of his actions on January 6. *Id*. Captain Yang writes to the Court not to excuse his father's conduct, but to "convey an idea of the tireless immigrant father that he was and how out of character this event has been in the context of his 23 years of dedicated employment at Motorola." *Id*. He is confident that, if provided the opportunity, "my father will continue to

contribute as a productive member of the American workforce." *Id*.  "[H]e has learned from this experience." *Id*.

Molly Hwang ("Ms. Hwang") is Mr. Yang's loving wife, and she calls him, "TJ." *See* Exhibit C.  Ms. Hwang is a staff member of an international flight company. *Id*.  "TJ is a good father and will do anything to support our children." *Id*.  She recalls a time when her daughter experienced homesickness during her first semester of college. *Id*.  For six (6) months, Mr. Yang drove from Chicago to Marquette University in Wisconsin every Friday to pick up his daughter, brought her home for the weekend, and brought her back to Marquette on Sunday, until the homesickness subsided. *Id*.  One year, the family moved from Hanover Park to Rolling Meadows. *Id*.  However, their son wanted to continue playing football at his previous high school in Hanover Park, despite his parents' attempts to persuade him not to. *Id*.  For their son to continue playing football, for an entire year, Mr. Yang drove their son to school in Hanover Park every morning and would pick him up from school every afternoon. *Id*.

Ms. Hwang tells this Court that "TJ has a good heart." *Id*.  Although Mr. Yang is not one to join groups or societies, he is quick to help the Tzu Chi Foundation (a nonprofit organization that helps poor people and those suffering from disasters) whenever the organization needs help with trimming bushes or doing light repairs in the building. *Id*.  When they lived in Rolling Meadows, Mr. Yang would help shovel snow from their senior neighbor's driveway or cut the grass. *Id*.  During COVID, Mr. Yang applied to work "from home" in his hometown in Taiwan to stay with his mother and help her for six (6) months. *Id*.  "He is a good son, a good father, a good husband and a good citizen." *Id*.  Regarding his actions on January 6, Ms. Hwang says this was a

11

"mistake" made by someone who "is not the person who will intentionally do something bad or something criminal." *Id*.  She asks this Court to give him a chance to continue to contribute to society and his family through his work in technology. *Id*.

Fred Cheng is Mr. Yang's work manager at Lenovo and has worked with him for almost twenty (20) years. *See* Exhibit D.  He says, "TJ has always demonstrated the utmost respect and kindness towards others at work …." *Id*.  He describes Mr. Yang as "a self-less individual always thinking about others and how they feel and how he can help them in their moments of need." *Id*. At work, Mr. Yang cannot help but talk about his family "proudly and with love and joy." *Id*. Although Mr. Yang "rarely makes mistakes" at work, when he does, he is the first to admit it and apologize to his teammates. *Id*.  Mr. Yang's "honesty and willingness to learn from his mistakes and turn around to make himself into a better person is what has made him continuously grow and earn the trust of others all these years." *Id*.

Andrew Lee ("Mr. Lee") is vice president of a plastics distribution company and has known Mr. Yang for over 25 years and is his "schoolmate, neighbor, and close friend." *See* Exhibit E.  As Mr. Yang's best friend, Mr. Lee does not know him as someone who harms others. *Id*.  Mr. Lee says that Mr. Yang has a "kindness mind" and is always there to lend Mr. Lee a hand, whether it be for home improvement projects, gardening, cleaning the garage, or car issues. *Id*.  Like Ms. Hwang, Mr. Lee is impressed with Mr. Yang's commitment to the Tzu Chi Foundation, especially the fact that Mr. Yang donates money monthly. *Id*.  Usually, Mr. Lee and Mr. Yang go on walks, hike, and play badminton and pickleball together, but after pleading guilty to this offense, Mr. Yang does not accept Mr. Lee's invitations to do those activities like before. *Id*.  Mr. Lee has noticed that

Mr. Yang is more conservative in sharing his opinions, which makes Mr. Lee feel that he is learning his lesson and trying to improve his actions during this time. *Id*.

Jiun-Guang Lin ("Mr. Len") is a civil engineer and has been a close friend to Mr. Yang and his family for 20 years. *See* Exhibit F.  Mr. Lin describes Mr. Yang as "compassionate" and highlights the "considerable amount of time and financial resources" Mr. Yang has spent promoting the quality of education for local kids in his hometown in Taiwan. *Id*.  Mr. Lin says Mr. Yang "is a proud American with an anti-communism sentiment." *Id*.  Mr. Lin has seen him take advantage of the opportunities America has provided and raise two successful and hardworking children with good values. *Id*.  Mr. Lin has witnessed Mr. Yang be remorseful for his actions on January 6 and feels he is "brave" in admitting to his wrongdoings and facing the consequences of his actions. *Id*. "As he stated [to me], this sobering experience has taught him to be humble and be perspective on looking at politics in the future." *Id*.

Feng-Jen Yang ("Feng-Jen") is a college professor and has known Mr. Yang for over thirty-seven (37) years, ever since they were in college together in Taiwan. *See* Exhibit G.  "Mr. Tyng Jing Yang is one of the most respectable and admirable people I know." *Id*.  Feng-Jen says Mr. Yang is "a hard-working and innovative professional, who has contributed to the advancement of technology and industry in his field." *Id*.  He sees Mr. Yang as "a generous and compassionate person, who has donated to various charitable causes and volunteered in his community." *Id*.  Feng-Jen was "shocked and saddened" to learn of Mr. Yang's involvement on January 6. *Id*.  "This was completely out of character for him." *Id*.  Feng-Jen has seen Mr. Yang express "deep remorse and regret" for his actions and "is determined to learn from this experience and never repeat it again."

*Id*.  Mr. Yang is "a good person who made a bad decision in a moment of confusion" and has "already suffered greatly from the consequences of his actions." *Id*.

Tseng-Li Liz Liu ("Liz Liu") is a certified public accountant with the Internal Revenue Service and is a close friend of Mr. Yang and his family for 20 years. *See* Exhibit H.  "Mr. Yang is a true gentleman and is always true to his words." *Id*.  Liz Liu describes Mr. Yang as "well respected in our community," "quiet and respectful," and "a person who can always be counted on by his family and friends – always following through with his promises …." *Id*.  Liz Liu was "surprised" to learn of Mr. Yang's involvement with January 6 and has seen Mr. Yang be "humbled by this experience" and "deeply remorseful regarding his actions." *Id*.  "Mr. Yang will strive to make amends." *Id*.

In sum, Mr. Yang is beloved by his family, friends, and coworkers.  All who are close to him believe in his goodness and that he is not defined by his actions on January 6.  Furthermore, everyone is confident that he will never again be before the Court, and they cannot wait for his full return to life.

### C.    Mr. Yang Poses Little or No Risk of Recidivism

Of all the purposes of sentencing, the need to protect the public from further crimes of the defendant is one of great practical concern and is the most capable of being measured.  Fortunately, Mr. Yang does not fit the archetype of a person who will commit new criminal offenses or recidivate.  And, because of the reinvigorated role of the judiciary in sentencing, judges can now impose sentences that take such research into consideration to more effectively impose sufficient, but not greater than necessary, sentences.

14

The judiciary's bolstered role is especially important given the Commission's own findings that "[t]here is no correlation between recidivism and guidelines' offense level. Whether an offender has a low or high guideline offense level, recidivism rates are similar. While surprising at first glance, this finding should be expected. The guidelines' offense level is not intended nor designed to predict recidivism." U.S. Sentencing Comm'n, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines* at 15 (May 2004) (hereinafter *Measuring Recidivism*). Thus, the Guidelines are at odds with 18 U.S.C. § 3553(a)(2)(C). Accordingly, the Supreme Court in *U.S. v. Booker* has freed the judiciary to remedy this inconsistency. *See* 543 U.S. 220 (2005).

In addition to what has already been described about Mr. Yang's character demonstrating his ability to reform, the Commission has also objectively quantified his low likelihood of recidivism. For example, the Sentencing Commission's study confirms that recidivism rates decline relatively consistently as age increases. *See Measuring Recidivism* at 12. With respect to Mr. Yang, who is sixty-one (61) years old, defendants over the age of fifty (50) with no criminal history points have a recidivism rate of only six-point-two percent (6.2%). *Id.* at 28.

Other findings by the Commission support the conclusion that Mr. Yang will not commit a criminal offense in the future. For example, defendants with no criminal history points who are legally married, like Mr. Yang, who has been married to Molly for thirty-four (34) years, have only a nine-point-eight percent (9.8%) recidivism rate. *Id*. at 29. Additionally, defendants with no criminal history points who are college graduates, like Mr. Yang, who has obtained bachelor's and master's degrees, have only a seven-point-one percent (7.1%) recidivism rate. *Id*. The

Commission has also found that first offenders like Mr. Yang are rarely reconvicted of a crime.  In fact, only two-point-five percent (2.5%) of first offenders with zero criminal history points and zero prior arrests are ever reconvicted.   U.S Sentencing Comm'n, *Recidivism and the First Offender* at Exhibit 6 (May of 2004).  There is, quite simply, nothing in the record to make this Court reasonably believe that Mr. Yang would commit any criminal offense in the future.

Beyond the statistics, Mr. Yang personally presents no risk of recidivism.  As detailed by his family and friends, Mr. Yang has lived his entire life guided by principles completely incongruous with his actions on January 6.   As shocked as those closest to him were by his arrest, no one was more devastated than Mr. Yang himself.  Although he has felt crushing shame, embarrassment, and guilt for his actions, he has since kept his focus on improving the lives of his family and friends, putting his best foot forward at work, and volunteering in his community.

It is unfortunate that the Guidelines' offense levels do not take into consideration such data.  Such data exists yet is not utilized to inform the Commission's rulemaking. However, without even considering the circumstances of the offense, it is apparent that Mr. Yang is not a person who is statistically likely to recidivate.  And, when one considers such statistics in light of Mr. Yang's personal history and characteristics, it is safe to assume that he will never again be arrested or charged with an offense.

### D.  The Need to Avoid Unwarranted Sentencing Disparities

An additional factor to consider is the "need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct."  18 U.S.C. § 3553(a)(6).  This factor has become especially important in sentencing January 6 cases.  This

District is well versed in the now eighty-six (86) page sentencing comparison chart of all January 6 defendants.[1]  For the sake of brevity and to focus the Court's attention, Mr. Yang asks the Court to consider cases in which this Court already imposed sentences.  Each contains important facts that distinguish Mr. Yang's conduct and support a sentence of probation.

In *United States v. Victoria White*, Ms. White pled guilty to violating 40 U.S.C. § 231(a)(3).  *See* 1:21-CR-00563-JDB.   The government asked for 4 months' incarceration, 36 months' supervised release, and $2,000 in restitution.  *Id*.   This Court sentenced Ms. White to 8 days' intermittent confinement, 3 months' home detention, and 24 months' probation. *Id*.  Ms. White's conduct was more serious than Mr. Yang's conduct.  A few weeks prior to January 6, Ms. White stated her desire on a live-feed internet show called, "The Patriots Lab," to take more serious action against "corrupt politicians" and be like "Cliven Bundy" in occupying a space and refusing to leave. *Id*. at ECF 82.  On January 6, Ms. White went to the Capitol and immediately began to push her way through the crowd of rioters toward the tunnel entrance to the Lower West Terrace, which was packed with rioters pushing against police officers who were in riot gear with riot shields. *Id*.  Ms. White helped hoist up another rioter from the crowd, and that rioter proceeded to assault officers by swinging from the top of the tunnel entrance and kicking the officers. *Id*.  Ms. White encouraged others to push forward to the front of the crowd of rioters, eventually succeeding to reach the Lower West Terrace entrance. *Id*.  Ms. White, standing directly in front of the line of officers in riot gear, again attempted to push through the line of officers, who were using their shields, batons, and other riot control equipment to keep the crowd back. *Id*.  Ms. White was

_____

[1] Available at https://www.justice.gov/usao-dc/capitol-breach-cases.

apprehended and arrested at the scene. *Id.*  A few days later, Ms. White discussed her participation in January 6 and her actions against police officers in interviews that were posted online. *Id.*

In *United States v. Stephanie Hazelton*, Ms. Hazelton pled guilty to violating 40 U.S.C. § 231(a)(3). *See* 1:21-CR-00030-JDB.  The government asked for 11 months' incarceration, 36 months' supervised release, and $2000 in restitution. *Id.*  This Court sentenced Ms. Hazelton to 10 days' incarceration, 90 days' home detention, 24 months' supervised release, and $2,000 in restitution. *Id.*  Ms. Hazelton's conduct was more serious than Mr. Yang's conduct, and her conduct involved joining in multiple confrontations with law enforcement officers, encouraging others to push against officers and waving rioters into areas that officers were trying to clear out. *Id.* at ECF 46.  She encouraged the crowd saying, "Let's go! Move forward! They cannot stop us all," and, "This is the battle. This is it. This is the battle." *Id.*  As the crowd was assaulting officers, she remained in the area yelling, "We need more men! We need more men! Keep going!" *Id.*

In no way minimizing Mr. Yang's conduct, it is important to note that his actions that day are not extreme when placed on the spectrum of January 6 defendants.  The facts and context of this case suggest that he was caught up in a regrettable and emotional moment he had not planned for, and the evidence does not support the contention that he went to the Capitol that day for the purpose of violence and destruction.

### E.  Mr. Yang's Public Demise is Adequate Deterrence to Others

Section 3553(a)(2)(B) requires the Court to consider "the need for the sentence imposed to afford adequate deterrence to criminal conduct."  There is no need for personal deterrence in this case, as he has endured severe shame and embarrassment in experiencing his loved ones and the

community's reaction to his conduct on January 6.  Mr. Yang, a devoted husband and loving father who has always centered and structured his life around his family's wellbeing, witnessed his wife and children suffer because of his actions.  Furthermore, Mr. Yang is not the type of person who would commit any further crimes in the future.  Mr. Yang has no criminal history or prior arrests, and this experience has been a defining moment in his life.

Arguably, the government already substantially achieved the maximal deterrent effect of Mr. Yang's offense simply by charging and convicting him.  As a result, numerous media outlets will discuss Mr. Yang and the substance of his offense, as they have done in the past.  Further, Mr. Yang will be discussed in various conversations and settings among family and friends and within certain professional environments for years to come, a shameful reality from which he simply cannot escape.  In short, Mr. Yang's public and professional demise sends a strong message to anyone who might attempt such conduct in the future.

## V.  CONCLUSION

Considering the above, Tyng Jing Yang respectfully requests that the Court impose a term of probation.

Respectfully submitted,

_____/s/_____
David Benowitz
D.C. Bar No. 451557
Paulette M. Pagán
D.C. Bar No. 1737374
Price Benowitz, LLP
409 7th Street, NW, Suite 200
Washington, D.C. 20004
(202) 417-6000
David@PriceBenowitz.com
*Counsel for Tyng Jing Yang*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on this 31st day of January 2024, I caused a true and correct copy of the foregoing Defendant's Memorandum In Aid of Sentencing to be delivered via CM/ECF to all parties in this matter.


_____/s/_____
David Benowitz