**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA,**<br><br>v.<br><br>**TYNG JING YANG,**<br><br>**Defendant.** | **Criminal Action No. 23-100 (JDB)** |
| **UNITED STATES OF AMERICA,**<br><br>v.<br><br>**ZACHARIAH BOULTON,**<br><br>**Defendant.** | **Criminal Action No. 23-284 (JDB)** |

## <u>MEMORANDUM OPINION</u>

Section 4C1.1 of the Sentencing Guidelines, effective November 1, 2023, provides for a two-level reduction in offense level for defendants with zero criminal history points who also meet various other criteria.  Among these criteria is that "the defendant did not use violence or credible threats of violence in connection with the offense."  U.S.S.G. § 4C1.1(a)(3).  In successive sentencings earlier this week, the Court considered the application of this requirement to otherwise-qualifying defendants sentenced on charges arising out of their participation in the January 6, 2021 assault on the U.S. Capitol.  The Court concluded that neither defendant could be fairly said to have engaged in violence or credible threats of violence within the meaning of § 4C1.1, and thus applied § 4C1.1's two-level reduction.  The Court indicated that it would memorialize and elaborate on these conclusions in a written opinion.

**Background**

The Court briefly recounts the facts from each case as relevant to the § 4C1.1 issue.

Tyng Jing Yang attended former President Trump's rally on January 6 and then proceeded to the U.S. Capitol.  Yang Presentence Investigation Rep. [ECF No. 31] ("Yang PSR") ¶ 20.  He entered the Capitol building through the Upper West Terrace door around 2:45 p.m.  Id. ¶ 21.  He walked upstairs, entered the Rotunda, exited the Rotunda for another part of the building, and then returned to the Rotunda around 3:03 p.m.  Id.  While there, he took pictures and spoke with Garrett Miller, another rioter.  Id. ¶ 22.  Shortly thereafter, law enforcement officers formed a long line across the Rotunda and began to press the mob back toward the door on the east side of the Rotunda.  Id. ¶ 23.  Yang and the other rioters did not voluntarily depart from the Rotunda in the face of this advancing police line.  Id.

The relevant conduct for present purposes occurred around 3:10 p.m. over a three-and-a-half-minute span.  See id. ¶¶ 24–25; see generally Yang Gov't Sent'g Ex. 1 (CCTV video).  During this time, Yang stood near the front of the crowd close to the police line.  This proximity notwithstanding, Yang's body language was generally nonconfrontational.  He kept his hands raised in the air above his shoulders for most of this period, and there is no evidence as to what if anything he said to officers.

Yang did, however, make physical contact with officers twice.  When a scuffle broke out nearby, officers surged forward and Yang briefly grabbed an officer's wrist.  He released it almost instantly and put his hands back up in the air, shaking them and shaking his head.  Not long after, Yang wound up behind Miller as officers pushed forward more steadily and Miller aggressively opposed them.  Yang grabbed Miller by the shoulders and pulled him back away from the police line.  He continued to restrain Miller as Miller barked at the officers.  When an officer approached

from the side and pushed Miller firmly with a baton, Yang—still holding Miller—briefly grabbed the baton as Miller fell backward.  Again, Yang let go quickly as he and Miller staggered backward together.  Yang continued to restrain Miller, and eventually pushed him back into the crowd away from the police line.  Yang left the Capitol building around 3:15 p.m.  Yang PSR ¶ 26.

Yang was charged by indictment with five counts: one felony—civil disorder, in violation of 18 U.S.C. § 231(a)(3)—and four misdemeanors—entering and remaining in a restricted building or grounds, in violation of 18 U.S.C. § 1752(a)(1); disorderly and disruptive conduct in a restricted building or grounds, in violation of 18 U.S.C. § 1752(a)(2); disorderly conduct in a Capitol building or grounds, in violation of 40 U.S.C. § 5104(e)(2)(D); and parading, demonstrating, or picketing in a Capitol building, in violation of 40 U.S.C. § 5104(e)(2)(G).  Indictment [ECF No. 19].  Yang pleaded guilty to the civil disorder count pursuant to a plea agreement with the government.  Yang PSR ¶ 4.  He admitted to making physical contact with the officers and agreed that this contact triggered a three-level sentencing enhancement.  Id. ¶¶ 24–25, 33.

Zachariah Boulton was also among the rioters at the U.S. Capitol on January 6.  Boulton Presentence Investigation Rep. [ECF No. 27] ("Boulton PSR") ¶¶ 20–21.  Boulton ascended the exterior stairs to the Upper West Terrace and entered the Capitol building through the Upper West Terrace Door around 2:29 p.m.  Id. ¶¶ 21–22.  He walked to the Rotunda, descended the Supreme Court Chamber steps, and exited the building roughly 15 minutes later, at 2:45 p.m.  Id. ¶ 22.  While inside, he filmed several videos and uploaded them to TikTok.  Id.  Following January 6, apparently on his drive back home to Georgia, Boulton posted several more TikTok videos defending his actions and those of other rioters.  Id. ¶ 23; see id. ¶ 20.  In one of these videos, he stated:

> [T]he tree of liberty from time to time needs to be watered with the blood of patriots and tyrants.  Don't come at me, oh, you lowered yourself by going into that Capitol

> building.  F*** that.  We need to send them a message now.  That they will
> understand, and that's it.  No property was really destroyed other than a window.
> But we made ourselves clear we will not stand by.  And shits gonna get real.  If
> you're not ready for that, go hide.

Id. ¶ 23.  In another, he stated that, while in the Capitol: "I didn't see anybody vandalizing
anything, I didn't see anybody stealing anything . . . .  But what I did see, is I did see a message
being sent to our corrupt politicians that was clear as day: Get ready people, because we're
coming."  Boulton Gov't Sent'g Ex. 3 (TikTok video).

Boulton was charged by information with the same four misdemeanors as Yang.
Information [ECF No. 14].  He pleaded guilty to entering and remaining in a restricted building or
grounds, in violation of 18 U.S.C. § 1752(a)(1), pursuant to a plea agreement with the government.
Boulton PSR ¶ 4.

The Court sentenced Yang and Boulton in separate proceedings on February 6, 2024.  Both
defendants sought a two-level decrease in their Sentencing Guidelines offense level pursuant to
§ 4C1.1.  In each case, the government opposed application of § 4C1.1 on the ground that the
defendant "use[d] violence or credible threats of violence in connection with the offense."
U.S.S.G. § 4C1.1(a)(3).  The Court applied § 4C1.1 to both Yang and Boulton and indicated it
would issue a written opinion further explaining its reasoning.

## Legal Standard

While the Sentencing Guidelines are no longer binding, "[s]entencing courts must
nonetheless begin all sentencing proceedings by correctly calculating the applicable Guidelines
range."  United States v. Turner, 21 F.4th 862, 864 (D.C. Cir. 2022) (cleaned up).  "[T]he
government bears the burden of proof in seeking sentencing enhancements under the Guidelines,
but the defendant bears the burden in seeking sentencing reductions."  United States v. Keleta, 552
F.3d 861, 866 (D.C. Cir. 2009).  Facts relevant to sentencing must generally be proven by a

preponderance of the evidence.  See U.S.S.G. § 6A1.3 cmt.; see also United States v. Watts, 519

U.S. 148, 156 (1997) (per curiam).

## Analysis

### I.   General Principles

The new § 4C1.1 ("Adjustment for Certain Zero-Point Offenders") provides for a two-level

reduction in offense level for defendants who "meet[] all of the following criteria":

(1) the defendant did not receive any criminal history points from Chapter Four, Part A;

(2) the defendant did not receive an adjustment under § 3A1.4 (Terrorism);

(3) the defendant did not use violence or credible threats of violence in connection with the offense;

(4) the offense did not result in death or serious bodily injury;

(5) the instant offense of conviction is not a sex offense;

(6) the defendant did not personally cause substantial financial hardship;

(7) the defendant did not possess, receive, purchase, transport, transfer, sell, or otherwise dispose of a firearm or other dangerous weapon (or induce another participant to do so) in connection with the offense;

(8) the instant offense of conviction is not covered by § 2H1.1 (Offenses Involving Individual Rights);

(9) the defendant did not receive an adjustment under § 3A1.1 (Hate Crime Motivation or Vulnerable Victim) or § 3A1.5 (Serious Human Rights Offense); and

(10) the defendant did not receive an adjustment under § 3B1.1 (Aggravating Role) and was not engaged in a continuing criminal enterprise, as defined in 21 U.S.C. § 848.

U.S.S.G. § 4C1.1(a).[1]  Put differently, to qualify, a defendant must have zero criminal history

points and certain aggravating factors must not be present.  The only criterion at issue here is the

---

[1] If a defendant receives a § 4C1.1 adjustment and has a Guidelines range in Zone A or B of the Sentencing Table, "a sentence other than a sentence of imprisonment . . . is generally appropriate." U.S.S.G. § 5C1.1 cmt. n.10(A).

third: "the defendant did not use violence or credible threats of violence in connection with the offense." Id. § 4C1.1(a)(3).

For purposes of § 4C1.1, "'[o]ffense' means the offense of conviction and all relevant conduct under § 1B1.3 (Relevant Conduct) unless a different meaning is specified or is otherwise clear from the context." Id. § 1B1.1 cmt. n.1(I); see id. § 4C1.1(b)(1). Relevant conduct includes "all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant" as well as certain acts of others when done as part of "a jointly undertaken criminal activity." Id. § 1B1.3(a)(1).

Neither § 4C1.1 nor other provisions in the Guidelines define the terms "use violence" or "use . . . credible threats of violence."[2] And the D.C. Circuit has not interpreted these terms as used here. Cf. United States v. Johnson, 64 F.4th 1348, 1352 (D.C. Cir. 2023) ("Our court has yet to determine what constitutes a 'threat to use violence' for purposes of [§ 2D1.1(b)(2)]."). Accordingly, the Court will look to the plain meaning of the terms at the time of enactment. See Tanzin v. Tanvir, 141 S. Ct. 486, 491 (2020); United States v. Hart, 324 F.3d 740, 745 (D.C. Cir. 2003).

Contemporary dictionaries define "violence" as "[t]he use of physical force, usu[ally] accompanied by fury, vehemence, or outrage; esp[ecially], physical force unlawfully exercised with the intent to harm," Violence, Black's Law Dictionary (11th ed. 2019), or as "the use of physical force so as to injure, abuse, damage, or destroy," Violence, Merriam Webster, https://www.merriam-webster.com/dictionary/violence. These definitions draw additional

---

[2] Similar language is used in § 2D1.1 of the Guidelines, which provides for an enhancement for certain drug offenses where the defendant "used violence, made a credible threat to use violence, or directed the use of violence." U.S.S.G. § 2D1.1(b)(2). But this provision does not include a definition either. And while § 4B1.2 defines "crime of violence," that definition is inapposite here because, inter alia, the elements-of-the-crime-inquiry set forth therein is inconsistent with § 4C1.1's directive to consider whether a defendant used violence in connection with the offense of conviction or other relevant offense conduct. See id. § 1B1.3(a)(1).

support from case law interpreting "violence" in similar contexts.  See, e.g., United States v. Pineda-Duarte, 933 F.3d 519, 523 (6th Cir. 2019) (defining "violence," as used in § 2D1.1(b)(2), as "acts where one uses physical force with the intent to injure"); United States v. Atkinson, 815 F. App'x 704, 708 (4th Cir. 2020) (unpublished per curiam) (same).

A "credible" threat is one that "offer[s] reasonable grounds for being believed or trusted." Credible, Merriam Webster, https://www.merriam-webster.com/dictionary/credible;  see also United States v. Bauer, Crim. A. No. 21-3862-2 (TNM), 2024 WL 324234, at *3 (D.D.C. Jan. 29, 2024) ("[A] 'credible threat of violence' is a believable expression of an intention to use physical force to inflict harm.").  Courts properly look to "contextual evidence" to determine whether a threat is credible.  Johnson, 64 F.4th at 1352.

## II.   Application of § 4C1.1 Here

### A.  United States v. Yang

The government advances both defendant-specific and more generalized arguments as to why Yang is not entitled to a two-level reduction under § 4C1.1.

First, the government contends that Yang's actions in the Rotunda constituted "violence" within the meaning of § 4C1.1.[3]  After carefully reviewing the video exhibits submitted by the government, the Court disagrees.  Even assuming Yang applied "physical force" insofar as he briefly made physical contact with two officers, the Court finds that this contact was not made with an intent to harm.  See, e.g., Pineda-Duarte, 933 F.3d at 523.  Nor was this contact accompanied by "fury, vehemence, or outrage," or the like.  The throughline of the definitions of "violence" is a degree of aggressiveness that is not present in this case.  True, Yang is near the

---

[3] The government does not argue that Yang "use[d] . . . credible threats of violence in connection with the offense."

front of the crowd opposing the line of officers.  Yet his body language is overtly nonconfrontational, with his hands raised in the air.  The two instances in which he made physical contact with officers were brief and reactive.  And in the latter instance, he briefly grabbed a baton while trying to pull another rioter back away from the police.  Viewing the evidence as a whole, the Court concludes that Yang did not act with the degree of aggression necessary to fairly characterize his actions as "violence."[4]

None of that is to excuse Yang's actions in the Rotunda.  He impeded law enforcement in their efforts to clear the area, and for that he was charged with and pleaded guilty to civil disorder (and received a sentencing enhancement for physical contact).  But this obstruction by itself does not equate to the use of violence.

The government also advances a broader argument: that § 4C1.1 should not apply here— and presumably not in any January 6 case—because "[e]very rioter, whether or not they personally engaged in violence or personally threatened violence, contributed to" the manifold harms of that day.  Yang Gov't Sent'g Mem. [ECF No. 34] at 17.  There is truth to the government's general point.  But it does not follow that the Court can disregard the inherently individualized analysis contemplated by § 4C1.1 in general and by the plain text of § 4C1.1(a)(3) in particular.  The relevant text requires that "the defendant did not use violence or credible threats of violence in connection with the offense."  U.S.S.G. § 4C1.1(a)(3) (emphasis added).  The inquiry turns on the actions of the defendant himself or herself, not the actions of others.[5]  See United States v.

---

[4] The § 4C1.1(a)(3) "violence" determination is necessarily case-specific.  And the three cases cited by the government where courts declined to apply § 4C1.1 all involved much more aggressive conduct than that at issue here.  See, e.g., United States v. Gundersen, Crim. A. No. 21-137 (RC), ECF No. 72, at 50 (July 25, 2023) (defendant "rushed [an officer] and forcefully slammed his heavy body into the officer's riot shield").

[5] The government has not advanced any argument that actions of other January 6 rioters are properly considered as relevant conduct under § 1B1.3(a)(1)'s "jointly undertaken criminal activity" provision.  Further, the defendant-specific language in § 4C1.1(a)(3) would appear to preclude reliance on a group-based theory of liability

Hernandez-Barajas, 71 F.4th 1104, 1106 & n.2 (8th Cir. 2023) (reaching same conclusion with respect to similar language in § 2D1.1(b)(2)).  This plain reading is reinforced by the contrast with the language of the very next provision, which requires that "the offense did not result in death or serious bodily injury."  U.S.S.G. § 4C1.1(a)(4) (emphasis added).  The Sentencing Commission and Congress knew how to frame a disqualifying factor in terms of the broader "result" of an offense and did so in subsection (a)(4), but (a)(3) is framed specifically in terms of actions taken by a defendant himself.  Cf. Bartenwerfer v. Buckley, 143 S. Ct. 665, 673 (2023) (noting that differences in statutory language are generally taken to be deliberate).

The Court thus rejects the government's violence-by-presence theory of § 4C1.1(a)(3).  In so doing, it joins the view of at least six other judges in this District.  See United States v. Hernandez, Crim. A. No. 21-445 (CKK), ECF No. 65, at 6–8 (D.D.C. Jan. 31, 2024); United States v. Bauer, Crim. A. No. 21-3862-2 (TNM), 2024 WL 324234, at *4 (D.D.C. Jan. 29, 2024); United States v. Isaacs, Crim. A. No. 22-338 (DLF) (D.D.C. Jan. 12, 2024) (oral ruling); United States v. Parks, Crim. A. No. 21-411-1 (APM) (D.D.C. Nov. 15, 2023) (oral ruling); United States v. Eicher, Crim. A. No. 22-38 (BAH), ECF No. 103, at 45–47 (Sept. 15, 2023) (oral ruling); see also United States v. Weyer, Crim. A. No. 22-40 (JEB) (D.D.C. Sept. 14, 2023) (oral ruling) (concluding that § 4C1.1 reduction would "likely" apply).  The government has not cited, and the Court is not aware of, any case reaching the opposite conclusion.

The government further suggests that § 4C1.1 should not apply because it is "based on recidivism data for offenders released in 2010," and "there is no reason to believe this historical data is predictive of recidivism for defendants who engaged in acts of political extremism on January 6."  Yang Gov't Sent'g Mem. at 18.  This argument fails for multiple reasons.  To begin,

---

as to this provision.  Id. § 1B1.1 cmt. 1(I) (noting that § 1B1.3(a)(1)'s definition of "offense" does not apply where "a different meaning . . . is . . . clear from the context").

speculation about the underlying analysis behind a Guidelines amendment is not a valid basis to disregard the Guidelines as enacted.  See Turner, 21 F.4th at 864 (noting courts' obligation to "correctly calculate[e]" the Guidelines range).  Further, § 4C1.1 did not become effective until November 2023.  The Sentencing Commission (and Congress) had almost three years after January 6 to craft a carveout excluding January 6 defendants from § 4C1.1's potential benefit but did not do so.  And finally, there is no indication that § 4C1.1's animating rationale does not hold true in this context—i.e., that despite the unprecedented nature of January 6, rioters with zero criminal history points who meet the other criteria may still be less likely to recidivate than those with prior criminal records.  See Eicher, Crim. A. No. 22-38, ECF No. 103 at 46.

The government's final contention is that, if the Court applies § 4C1.1, it "should nevertheless vary upwards by two levels to counter any reduction in offense level."  Yang Gov't Sent'g Mem. at 18.  The government does not ground this request in any Guidelines provision, and the Court declines to simply add offense levels to "offset" the operation of § 4C1.1—or the application of any other Guidelines provision.  The Court will, as it does in each of these cases, look to the events of January 6 and the defendant's involvement as part of a holistic assessment of the § 3553(a) factors to determine whether a variance is warranted.

Accordingly, the Court concludes that Yang "did not use violence or credible threats of violence in connection with the offense" and thus that he is eligible for the two-level reduction under § 4C1.1.

### B.  United States v. Boulton

In its briefing, the government argued only that Boulton was not entitled to a § 4C1.1 reduction based on the generalized theories discussed and rejected above.  At sentencing, however, the government debuted a new argument: that Boulton's post-January 6 TikTok videos amounted

to "credible threats of violence."[6]  The Court rejects the argument.  While Boulton's rhetoric is concerning, he made these statements after the fact, apparently while driving home to Georgia. And in assessing whether a threat is "credible," courts routinely look to contextual evidence, including the defendant's ability to make good on the threat.  See Johnson, 64 F.4th at 1352 (emphasizing that the defendant "was . . . armed," "had been convicted of several violent crimes, including shooting someone," and had a powerful motive to carry out the threat); see also United States v. Miller, Crim. A. No. 22-495 (PAB), 2024 WL 363731, at *4 (N.D. Ohio Jan. 26, 2024) (collecting case law and concluding that a common element is "some temporal and spatial proximity between the defendant, his threat, and his intended victim").  That is not to say that an after-the-fact threat can never be credible for purposes of § 4C1.1.  But after considering all the circumstances present here—including the nature of Boulton's statements, his conduct on January 6, and the fact that these statements occurred after the offense when Boulton was no longer present in D.C.—the Court concludes that any threats made by Boulton were not "credible threats of violence [used] in connection with the offense."  Hence, the Court concludes that Boulton is also eligible for the two-level reduction under § 4C1.1.

## III.    Conclusion

As another judge in this District has remarked, "all [of the January 6] cases are the same and they are all different."  United States v. Baquero, Crim. A. No. 21-702 (JEB) (May 22, 2023) (oral ruling).  They are the same in that the events of January 6 represented an unprecedented assault on the foundations of our democracy, and every rioter bears some degree of responsibility for that lasting harm.  But they are different in that the conduct of each rioter varied dramatically, from individuals who entered the Capitol only briefly to those who assaulted police officers and

---

[6] The government does not argue that Boulton "use[d] violence."

destroyed property.   The plain language of § 4C1.1(a)(3) calls on the Court to consider this individualized conduct when assessing whether a defendant is entitled to a two-level reduction in offense level.   And, for the reasons stated above, the Court concludes that application of the reduction is warranted in Yang's and Boulton's cases.

                                                              /s/
                                                    _____
                                                    JOHN D. BATES
                                                    United States District Judge

Dated: <u>February 9, 2024</u>